1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| ELIJAH PAGE, | CASE NO. 3:23-cv-05849-DGE |
| Plaintiff, | ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) |
| v. | |
| CLARK COUNTY FIRE DISTRICT 6 et al., | |
| Defendant. | |

## I.    INTRODUCTION

Defendants Clark County Fire District 6 (the "District"), Fire Chief Kristan Maurer, Chief David Russell, Chief David Schmitt, and Captain Eric Simukka (collectively, the "District Defendants") move to dismiss on summary judgment all of Plaintiff Elijah Page's remaining claims filed against them.  (Dkt. No. 64.)  Page's claims relate to Defendant Jon Erickson's June 7, 2022, conduct in which Erickson placed a knotted rope around Page's neck.  For the reasons stated herein, the District Defendants' motion for summary judgment is GRANTED.

1

## II.    BACKGROUND

2    **A.  Employment of Page and Erickson.**

3        On February 24, 2022, Page and Erickson were identified as new District hires.  (Dkt.

4    No. 67-1 at 2.)  Page was hired as an Entry Firefighter and Erickson was hired as a Lateral

5    Firefighter/Paramedic.  (*Id.*)

6        As part of the hiring process, Erickson underwent a background check, which included a

7    Washington State Patrol criminal history check and a review of his social media.  (Dkt. No. 65-6

8    at 5–6.)  The District also conducted a psychological evaluation.  (*Id*. at 10.)  The District did not

9    identify any information indicating that Erickson harbored racial bias or animus.  (*Id*. at 11.)

10        On May 1, 2022, Erickson and Page started the District's fire academy with their recruit

11    class as probationary employees.  (*See* Dkt. No. 68-1 at 3.)  Page was the only African American

12    member of the recruit class.  (Dkt. No. 83 at 1.)

13    **B.  Erickson Places Knotted Rope around Page's Neck during Lunch Hour**

14        On June 7, 2022, the recruit class was receiving training on knot tying.  The District

15    instructed the recruits to practice knot tying during their lunch break.  (Dkt. No. 82-9 at 14; *see*

16    *also* Dkt. No. 65-13 at 22–27.)  During lunch, Erickson "began tying a prussik with a double

17    fisherman's knot" and then placed it over Page's head/neck.  (Dkt. No. 65-13 at 28.)  The prusik

18    knot "could be perceived as a noose [because] it has a barrel-type pattern resembling . . . a

19    noose" though "it does not function as a noose."  (Dkt. No. 82-9 at 6.)  Page described the

20    incident as follows: "I was seated at my desk in the training class room.  John Erickson walked

21    over to my desk and placed a noose around my neck and tightened the knot."  (Dkt. No. 65-13 at

22    27.)  "As an African American, [Page] was acutely aware of the racial significance and historical

23    context of lynching, which made the incident not only threatening but deeply humiliating."  (Dkt.

24

No. 83 at 1.)  "[The] act was unwelcome, offensive, and carried a terrifying historical weight for [Page]."  (*Id*. at 2.)

Page estimates the incident lasted five to ten seconds.  (Dkt. No. 65-1 at 11.)  He was upset his fellow recruits failed to say anything and did not otherwise attempt to defend him in the moment, even though "they observed what had transpired."  (*Id*. at 10.)  Shortly after the incident, class instruction resumed.  (*Id*. at 16.)

**C.  Investigation Following the Incident**

Immediately following the incident, Class Captain Riley Hawken (a fellow recruit) texted Company Officer Mason Svatos.  (Dkt. No. 65-14 at 2–5.)  Hawken briefly reported what had happened, voiced his concern about the incident, and sought direction on what should be done. (*Id*.)  Svatos was uncertain.  (*Id*.)  At the afternoon break, Hawken and Svatos met to discuss the matter and shortly thereafter Page approached them.  (Dkt. No. 65-12 at 3.)  Hawken and Svatos expressed the incident was not acceptable and asked Page his preference on proceeding.  (*Id*.) Hawken then reported the incident to Captain Simukka.  (*Id*. at 4.)

Captain Simukka contacted Chief Russell, who then met with Page and Svatos.  (Dkt. Nos. 65-10 at 4–5, 65-9 at 4.)  During this meeting, Chief Russell informed Page the "would handle it from here," beginning with performing an investigation and taking immediate action. (Dkt. No. 65-9 at 5.)  Chief Russell also directed Captain Simukka to obtain written statements from all persons who were present and witnessed the incident.  (*Id*. at 5.)  Chief Russell further asked Captain Simukka to "move Erickson to an office and have him write a statement[.]"  (*Id*.) Chief Russell then sought assistance with the investigation from Chief Schmitt.  (*Id*.)  Chief Russell also discussed possible peer support services with Page and advised Page he could leave for the remainder of the day if he wished.  (*Id*. at 6.)

1    Chief Russell then spoke with Erickson about the incident. (*Id*. at 7.) Chief Russell

2  subsequently placed Erickson on Administrative leave for the remainder of the day, gathered

3  Russell's belongings, and escorted him off District property. (*Id*. at 8.)

4    Captain Simukka and Chief Russell met with the recruit class after Erickson was escorted

5  off District property. (Dkt. No. 65-10 at 8.) They told the class that an investigation had to

6  occur and that the class would be informed as some point of the process and what was

7  happening. (*Id*.) During this meeting, Captain Simukka advised the class that other firefighters

8  likely would try to ask them about the incident:

9         You're one month into the academy. When you leave the room today, you're
          gonna have people - - senior firefighters, tenured firefighters, say, Hey, what's
10        going on? What happened? We heard this. To avoid getting wrapped up into the
          rumor mill or coffee table talk, the investigation is occurring. Confidentiality
11        needs to be maintained during the investigation to protect the process.

12  (*Id*. at 8–9.) Captain Simukka further stated, "So just, Don't [sic] get caught up in the rumor mill

13  and gossip talk, because it tends to run rampant in the firehouse." (*Id*. at 9.)

14    Chief Russell and Chief Schmitt contacted and eventually met with Fire Chief Maurer to

15  review the details of the incident and determine how to handle the investigation. (Dkt. No. 65-9

16  at 9–10.) Chief Schmitt was assigned to handle the investigation. (*Id*. at 10.)

17    After speaking with Chief Russell and Chief Schmitt by phone on the day of the incident,

18  Fire Chief Maurer called Page. (Dkt. No. 65-11 at 5.) Page acknowledges Fire Chief Maurer

19  called him, asked him how he was doing, and asked permission to speak with Page's wife. (Dkt.

20  No. 65-1 at 29–30.) Fire Chief Maurer also informed Page she planned on contacting the County

21  Sheriff to discuss the incident. (*Id*. at 30.) In between calling Page and his spouse, Fire Chief

22  Maurer called the Board of Commissioners. (Dkt. No. 65-11 at 5.) The following day, Fire

23  Chief Maurer spoke with the Sheriff about the incident and sought advice on whether a crime

24

1    had occurred.  (Dkt. No. 65-11 at 7–8.)  Fire Chief Maurer believed the Sheriff would speak with

2    the prosecutor's office about the incident and then follow up with her as necessary.  (*Id*. at 8.)

3    According to the Sheriff, however, he "was not told that there was any noose put around Elijah's

4    neck at all."  (Dkt. No. 82-4 at 16.)

5            The District produced an investigation report after interviewing Page, Erickson, and all

6    witnesses to the incident.  (Dkt. No. 65-13.)  The investigation did not reveal any prior conflict

7    between Page and Erickson leading up to the incident.  (Dkt. Nos. 65-6 at 7–8, 65-10 at 13, 65-

8    11 at 18, 65-12 at 12.)  The investigation report was not sent to the Sheriff.  (Dkt. No. 65-11 at

9    8.)

10           Page never reported the incident to law enforcement and testified he was advised not to

11   talk about the incident:

12           Q. And you never reported [the incident] to the police, correct?

13           A. No, ma'am, we were advised not to.

14           Q. Who advised you not to report this to the police?

15           A. We were advised not to talk about it.

16           Q. Who advised you not to report this to the police?

17           A. We were advised not to talk about this incident, ma'am.

18           Q. Are you speaking of Captain Simukka?

19           A. And Chief Maurer.

20           Q. And that's what you've referred to as the gag order, correct?

21           A. Yes.

22   (Dkt. No. 65-1 at 39.)  Asked further, Page confirmed Fire Chief Maurer's memo and Captain

23   Simukka's statement in class were the two statements he refers to as the "gag order":

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) - 5

1

2

Q. Okay.  So we have Chief Maurer in her email and then Captain Simukka in the class and then you're not sure about [Chief] Russell.  What about anybody else you recall telling you that you were prohibited from talking about the incident?

3

A. No, ma'am.

4  (*Id*. at 46.)  Based on Fire Chief Maurer's memo and Captain Simukka's statement to the class,

5  Page concluded, "I was instructed specifically not to discuss the incident within the firehouse or

6  with outside parties, severely limiting my ability to seek help or process the assault.  I knew that

7  violation of the order could mean termination."  (Dkt. No. 83 at 2.)

8  **D.  Erickson's Employment Terminated**

9  On June 9, 2022, Fire Chief Maurer terminated Erickson's employment.  (Dkt. No. 65-13

10  at 31.)  The termination letter informed Erickson he had "not successfully met [the] probationary

11  period and [would] no longer be employed by the District."  (*Id*.)  While the letter did not

12  reference the incident at all, Fire Chief Maurer terminated Erickson's employment specifically

13  because of the incident involving Page.  (Dkt. No. 65-11 at 9.)  The District explained:

14

15

16

17

Jon Erickson was terminated based on failure to pass his probation and based on the fact that he was a temporary employee and made another employee feel uncomfortable based on the situation that that was terminable in our view and there was no need to go any further past that.  The - - you know, the objective of the investigation was to determine what happened and then come to a swift conclusion on it and put the thing behind Mr. Page.

18  (Dkt. No. 82-2 at 11.)  In terminating Erickson, the District did not determine whether Erickson

19  had violated the District's policies against workplace violence, harassment, or discrimination.

20  (*Id*. 11–12.)

21  **E.  Fire Chief Maurer's District-wide Memorandum**

22  On June 9, 2022, Fire Chief Maurer issued a District-wide memorandum stating:

23  The District has terminated employment with Firefighter/Paramedic Jon Erickson . . . .

24

> There was an incident in the academy and the District took swift and appropriate action. An investigation was competed, and the decision was made that Mr. Erickson did not successfully meet his probationary period.
>
> As with any disciplinary action, the District maintains confidentiality. I would ask that we all respect each other's privacy and not contribute to passing along erroneous information. There are only a few personnel that were involved in this process that know all the details.
>
> All personnel involved, including Mr. Erickson have been offered EAP and Peer Support. When the time is appropriate, the District will evaluate what changes we can make to ensure that this type of incident doesn't occur in the future.

(Dkt. No. 65-17 at 2.) Fire Chief Maurer distributed the memo via email to all members of the District, including the District's Board, and posted it on the District's internal web page. (Dkt. No. 65-11 at 16.) Fire Chief Mauer did not discuss the memo with the District's Board and never received any comments from the Board. (*Id*.)

### F.  Page's Separation from the District

On June 15, 2022, Chief Schmitt informed Page the investigation was concluded and that the District had taken "action to terminate the individual responsible for the actions." (Dkt. No. 65-18 at 2.)

On July 1, 2022, Page injured his knee while training. (Dkt. No. 65-19 at 2.) He then graduated from the training academy, but was immediately placed on light duty between August and November 10, 2022. (Dkt. No. 65-20 at 2.) On November 16, 2022, Page reported to his counselor he planned to return to the Sheriff's office:

> [Page] said [he] is going back to the sheriff's office. He said he got rear ended the 2nd week of academy. He said he also got COVID. He injured his knee and had surgery in September. He was on light duty until two shifts ago. He reported an eight year veteran firefighter fastened a noose around neck. He said this was shocking. As for the job, he said he doesn't love it because he is not home at night and doesn't want to "play the game" at 41 years old. He said there is no overtime. Other than the hazing, he has good relationships with his coworkers, but he misses his family. He said he doesn't want to disappoint who encouraged

1

2

him to switch to fire.  He is waiting for a timeline to go back to the Sheriff's
Office.

3

4

5

(Dkt. No. 65-21 at 4.)  Referring to his employment at the District, Page also commented in a

text message that he was "[j]ust not feeling it.  It could be because of light duty . . . who knows.

That and pay[.]  I make almost 10$ . . . less than where I was at.  Money is tight.  If I go back, I'll

be making [what I make at the District] with a 25K bonus."  (Dkt. No. 65-22 at 2.)

6

7

8

9

On December 27, 2022, Page provided a two-week resignation notice, stating that he was

grateful for the opportunity to work at the District and that he "appreciated the support" he

received.  (Dkt. No. 65-23 at 2.)  Page stated his decision to resign "was not taken lightly but it

[was] in the best interest of [his] family moving forward."  (*Id.*)

10

11

12

13

14

Page applied for a position with the Sheriff's office.  In his application for employment,

Page wrote why he left his employment with the District:  "I want to return to the sheriff's office

as the schedule allows me to be home every night with the kids and family, being away for a full

24 hours has put an increased burden on my wife that she now cares for the kids by herself on

top of her managing her career."  (Dkt. No. 65-1 at 40.)

15

16

17

18

19

20

In response to the present motion, Page states he was forced to resign from the District:

Forced Resignation: Due to the hostile environment and the failure of FD6 to
adhere to its own policies regarding discrimination and harassment and workplace
violence, I felt unsafe continuing to work at FD6, particularly sleeping in the
same location where I was assaulted. My resignation was a direct result of these
conditions, which constituted a constructive discharge.

. . .

21

22

Reflecting on the Incident: It was both unreasonable and unsafe for me to
continue working in an environment where my colleagues had observed the
assault without intervening. I could not trust my life to individuals who had
shown a profound disregard for my safety[.]

23

(Dkt. No. 83 at 3.)

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) - 8

1

### G. District's Policies and Training

2      On July 17, 2019, the District's insurer, Volunteer Fireman's Insurance Services (VFIS),

3 issued a Management Liability/Employment Practices Liability Assessment Report.  (Dkt. No.

4 82-1 at 42–85.)  The VFIS report recommended that the District address certain items, and

5 concluded that discriminatory harassment training, discriminatory harassment, and grievance

6 procedure[s] should be considered high priorities.  (*Id*. at 45–46.)  VFIS's report documented the

7 District's policies of requiring new employees to complete discriminatory harassment training

8 within the first six months of hire and requiring that all employees complete refresher training

9 every two years.  (*Id*. at 58.)  The report recommended "mandatory annual training on

10 harassment, discrimination and retaliation prevention for all District personnel" rather than every

11 two years.  (*Id*.)  The report also recommended annual harassment prevention training and the

12 inclusion of additional training policy components such as modules on gender identity, gender

13 expression, pregnancy, and marital status.  (*Id*. at 64, 63).  The report further suggested that the

14 District update the scope of its no tolerance and non-confrontation policies.  (*Id*.)

15      At the time of the incident, the recruits had not received formal training on discriminatory

16 harassment.  However, Fire Chief Maurer stated that "[w]hen [recruits] start the academy, they

17 are immediately given access to all the policies [on discriminatory harassment] and told to

18 review the policies.  But at that point, there had been no formal training on that policy, other than

19 self review." (Dkt. No. 82-3 at 15.)  Training on discrimination, harassment, or workplace

20 violence was not part of the recruits' academy curriculum.  (Dkt. No. 82-6 at 13.)  The District

21 did not have a formal policy against hazing, bullying, and pranks until after the incident.  (*Id*. at

22 36.)

23

24

Regarding "horseplay" at the District, Hawken described: "I would say there are little pranks that happen. I wouldn't necessarily say frequently but little pranks that happen throughout the firehouse[.]" (Dkt. No. 82-8 at 6.) Hawken then described what he has observed: "I would say one that I can think off of top of my head where they'll take your bed from your bunk and they'll put it into a different room and they'll make your bed[.]" (*Id*.) Hawken also had heard of a rumor that a prank involving shaving cream had damaged someone's personal items. (*Id*. at 7.)

Erickson described a drill where it was hot and a person decided to pull their own shorts up real tight, and instances where a person might bump another person to slow them down while climbing a drill tower at the same time. (Dkt. No. 82-9 at 16.)

Captain Simukka acknowledged "horseplay" occurred at the District.

> Well, this is a - - you know, firefighting, you're living with somebody for 24 hours every third day. You become family. Siblings have horseplay. It happens here, too. It's usually very benign in nature, and it's just part of how a - - shift bonds and grows. It's not - - you know, it's not unusual.

(Dkt. No. 82-5 at 16.) As examples of horseplay, Captain Simukka described using a second remote to change channels on a television screen to annoy another person (*id*. at 18–19), a bucket of water being dumped on a person when walking through a doorway (*id*. at 19), a "confetti bomb" in a locker (*id*.), or giving someone a "noogie" by rubbing knuckles on someone's head (*id*.). "It's, you know, just teasing and bantering like that . . . like, a sibling rivalry kind of thing[.]" (*Id*.) In discussing Erickson's conduct on June 7, 2022, Captain Simukka stated, "It's not something I would do as horseplay."[1] (*Id*. at 24.)

---

[1] Counsel for Page also asked Captain Simukka whether "depending on the context" a person wrapping a rope around another person at the District might be considered horseplay; to which Captain Simukka responded, "depending on the context." (*Id*. at 31, 33.) The record does not identify what context counsel for Page was referring to.

Fire Chief Maurer acknowledged it was not uncommon for recruits to joke around: "Yeah, they joke around.  They get - - like I said, they're a tight group.  So they start treating each other like brothers and sisters a little bit."  (Dkt. No. 82-3 at 53.)

Chief Russell also acknowledged physical horseplay that may be tolerated depended on the scenario:

> I think it would certainly determine(sic) on all parts of the scenario and body language and verbal and nonverbal communication that's, you know, being displayed between two people, you know, and kind of the tone, and emotion of that scenario to be tolerated.  But all those considered, you know, which is a lot, then, yeah, I could see [physical horseplay] being tolerated.

(Dkt. No. 82-7 at 11–12.)

> I think there's a lot of gray there that would have to be determined by the overall action.  But I think that you're on to something there, that, yes, if witnesses or people involved are offended, then I think it crosses a line to what may or may not be tolerable and tolerated.

(*Id*. at 29–30.)

There was no formal training on acceptable or unacceptable horseplay at the District.  (*Id*. at 34.)  Recruits "would have to derive it from the description in the conduct policies of what types of conduct are prohibited."  (*Id*. at 34.)  The District trusts its "members will exercise good judgment in their behavior."  (*Id*. at 36.)

### H.  Procedural History

On November 3, 2023, Plaintiff filed an amended complaint asserting the following claims:

- Claim 1: against the District Defendants for disparate treatment under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, for disparate treatment.  (Dkt. No. 20 at 27.)

- Claim 2: against all Defendants for hostile work environment pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986.  (*Id*. at 28.)

- Claim 3: against the District and Jon Erickson for hostile work environment caused by coworker pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986. (*Id.* at 29.)

- Claim 4: against the District Defendants for hostile work environment caused by supervisor pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986. (*Id.* at 30.)

- Claim 5: against District Defendants for First Amendment violation pursuant to 42 U.S.C. §§ 1983-1988. (*Id.* at 32.)

- Claim 6: against the District Defendants for conspiracy to obstruct justice pursuant to 42 U.S.C. §§ 1983-1988. (*Id.* at 32.)

- Claim 7: against the District and Fire Chief Maurer for "neglect to prevent" brought pursuant to 42 U.S.C. §§ 1983-1988. (*Id.* at 33.)

- Claim 8: against Erickson and the District for hate crime pursuant to Washington Revised Code § 9A.36.083. (*Id.* at 34.)

- Claim 9: against Erickson and the District for a state law claim of battery. (*Id.*)

- Claim 10: against all Defendants for violation of the Washington Law Against Discrimination ("WLAD"), Washington Revised Code Chapter 49.60. (*Id.* at 35.)

- Claim 11:  against all Defendants for wrongful discharge – constructive. (*Id.* at 36.)

- Claim 12: against all Defendants for wrongful discharge in violation of public policy. (*Id.* at 37.)

- Claim 13: against all Defendants for outrage. (*Id.* at 38.)

- Claim 14: against all Defendants for negligent infliction of emotional distress. (*Id.* at 39.)

- Claim 15: against the District Defendants for negligent training/supervision. (*Id.* at 40.)

On May 7, 2024, the Court dismissed Page's claims for Hate Crime under Washington Revised Code § 9A.36.083 (Claim 8) and Battery under Washington state law (Claim 9) against

1    the District.  (Dkt. No. 39.)  The District Defendants now move to dismiss all remaining claims

2    against them.  (Dkt. No. 64.)

3                     **III.    DISCUSSION**

4    **A. Legal Standard**

5          Summary judgment is proper only if the pleadings, the discovery and disclosure materials

6    on file, and any affidavits show that there is no genuine issue as to any material fact and that the

7    movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is

8    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

9    showing on an essential element of a claim in the case on which the nonmoving party has the

10    burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

11    of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

12    for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

13    (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

14    metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

15    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

16    requiring a judge or jury to resolve the differing versions of the truth.  *T.W. Elec. Service Inc. v.*

17    *Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

18          The determination of the existence of a material fact is often a close question.  The court

19    must consider the substantive evidentiary burden that the nonmoving party must meet at trial—

20    e.g., a preponderance of the evidence in most civil cases.  *Id.*

21

22

23

24

       [T]he nonmoving party may not rely mere allegations in the pleadings in order to
       preclude summary judgment.  Instead, the nonmoving party must set forth, by
       affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is
       a genuine issue for trial.  Hence, the nonmoving party may not merely state that it
       will discredit the moving party's evidence at trial and proceed in the hope that
       something can be developed at trial in the way of evidence to support its claims.

Instead, it must produce at least some significant probative evidence tending to support the complaint.

*Id*. (internal quotation marks and citations omitted).  Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

## B.  Page's §1981 Claim as an Independent Cause of Action

District Defendants argue "Plaintiff does not have an implied cause of action under 42 U.S.C § 1981."  (Dkt. No. 64 at 14.)

"Section 1981 establishes substantive rights that a state actor may violate.  It does not itself contain a remedy against a state actor for such violations.  A plaintiff seeking to enforce rights secured by § 1981 against a state actor must bring a cause of action under § 1983." *Yoshikawa v. Seruirant*, 74 F.4th 1042, 1047 (9th Cir. 2023).  Accordingly, to the extent Page asserts a violation of rights granted under § 1981 *independent* of Page's § 1983 claim(s), these claims are dismissed as a matter of law.

Notwithstanding, Page states: "every claim brought in this case to enforce a right under § 1981 is simultaneously pursued under § 1983."  (Dkt. No. 81 at 30.)  Thus, the Court analyzes Page's claims for disparate treatment and hostile work environment under § 1983, thereby providing Page the benefit of the doubt that Page seeks to enforce rights granted under § 1981 vis-à-vis § 1983.

## C.  Page's § 1983 Claims (Claims 1, 2, 3, 4, 5, 6, and 7)

"To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

1

2

       1.  Page's § 1983 Claims Based on § 1981—Disparate Treatment and Hostile Work Environment

3

       *a.  Disparate Treatment*

4

To establish disparate treatment under Title VII,[2] a plaintiff "must offer evidence that

5

'gives rise to an inference of unlawful discrimination,' either through the framework set forth in

6

*McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory

7

intent." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (alteration marks

8

omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

9

The *McDonnell Douglas* framework contains three burden-shifting steps.  *McDonnell*

10

*Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973).  First, the plaintiff must make a prima

11

facie case of discrimination, which requires a showing that "'(1) he is a member of a protected

12

class; (2) he was qualified for his position; (3) he experienced an adverse employment action;

13

and (4) similarly situated individuals outside his protected class were treated more favorably.'"

14

*Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (quoting *Peterson*

15

*v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)).  Once a plaintiff has established a

16

*prima facie* case, the burden then shifts to the defendant to show a legitimate, nondiscriminatory

17

reason for the challenged actions.  *See McDonnell Douglas*, 411 U.S. at 802.  The burden then

18

returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual.

19

*See id*. at 804.  Thus, "the disparate treatment theory does require proof of discriminatory intent."

20

21

22

23

[2] Disparate treatment and hostile work environment have the same elements regardless of whether they are brought under § 1981 or Title VII.  *See Knight v. Brown*, 797 F. Supp. 2d 1107, 1124, 1132 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012).  Thus, this Court relies on cases regardless of the governing statute.  In addition, "a plaintiff is not required to exhaust administrative remedies before bringing a § 1981 claim."  *Turner v. Dept. of Educ. Hawaii*, 855 F. Supp. 2d 1155, 1171–72 (D. Haw. 2012) (citing *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008).

24

1    *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021) (citing *Garcia v. Spun Steak Co.*,

2    998 F.2d 1480, 1484 (9th Cir. 1993)).

3          The District Defendants assert the disparate treatment claim[3] "fails as a matter of law

4    because [Page] did not raise specific facts demonstrating an adverse employment action or a

5    failure to take prompt and adequate corrective action."  (Dkt. No. 93 at 8.)

6          "[A]n adverse employment action is one that 'materially affect[s] the compensation,

7    terms, conditions, or privileges of . . . employment.'"  *Davis v. Team Elec. Co.*, 520 F.3d 1080,

8    1089 (9th Cir. 2008) (quoting *Chuang v. University of Cal. Davis, Bd. of Trustees*, 225 F.3d

9    1115, 1126 (9th Cir. 2000)).

10          Page argues "he suffered adverse employment actions, notably being subjected to a

11    simulated lynching described dismissively as 'horseplay' by defendants, coupled with gag orders

12    that hindered his ability to seek redress."  (Dkt. No. 81 at 32.)  Page also cites various cases in

13    which he identifies "a wide array of disadvantageous changes in the workplace constitute

14    adverse employment action."  (*Id*. at 33) (quoting *Ray v. Henderson*, 217 F.3d, 1240 (9th Cir.

15    2000).  Page concludes, "[t]he gag orders imposed on Elijah Page qualify as such [adverse

16    employment] actions."  (*Id*. at 34.)

17          None of the decisions Page identifies involve a probationary co-worker, who on a single

18    occasion engaged in unwanted behavior.  The Court is unaware of, and Page fails to identify, any

19    authority supporting the proposition that the one-time actions of a probationary co-worker

20

21

22    ────────────────────
      [3] This argument is made in opposition to Page's WLAD claim as the District Defendants do not
      directly address Page's § 1981 disparate treatment claim.  (Dkt. No. 91 at 8–9.)

23    Notwithstanding, because the District Defendants assert Page suffered no adverse employment
      action and because an adverse employment action is an element of a § 1981 disparate treatment
24    claim, the Court analyzes this issue as it relates to Page's § 1981 disparate treatment claim.

1  constitute an adverse employment action *by the employer* that materially affected the

2  compensation, terms, conditions, or privileges of employment.

3       As for Page's claims that the "gag orders" in this case qualify as an adverse employment

4  action, the Court is unconvinced. Page asserts his "need to speak out about the assault place[d] a

5  disproportionate burden on him under the gag orders compared to his peers. Page endured more

6  severe adverse effects from the orders due to the racial context of his assault." (Dkt. No. 81 at

7  34–35.) But Page fails to explain how instructing employees that "[c]onfidentiality needs to be

8  maintained during the investigation to protect the process" (or that "the District maintains

9  confidentiality[, therefore,] I would ask that we all respect each other's privacy and not

10  contribute to passing along erroneous information") materially affected Page's compensation,

11  terms, conditions, or privileges of employment. Page offers no evidence identifying a change in

12  Page's terms of employment resulting from the "gag orders."

13       Page has failed to establish an adverse employment action and, therefore, fails to

14  establish a disparate treatment claim under § 1981 vis-à-vis § 1983.

15             *b.  Hostile Work Environment*

16       To prevail on a hostile work environment claim, a plaintiff "must show that her

17  'workplace [was] permeated with discriminatory intimidation . . . that [was] sufficiently severe

18  or pervasive to alter the conditions of [her] employment and create an abusive working

19  environment.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (quoting *Harris*

20  *v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "The working environment must both

21  subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland* 47 F.3d 1522,

22  1527 (9th Cir. 1995).

23          Because only the employer can change the terms and conditions of employment,
           an isolated incident of harassment by a co-worker will rarely (if ever) give rise to

24

1

2

3

4

> a reasonable fear that . . . harassment has become a permanent feature of the employment relationship.   By hypothesis, the employer will have had no advance notice and therefore cannot have sanctioned the harassment beforehand.  And, if the employer takes appropriate corrective action, it will not have ratified the conduct.  In such circumstances, it becomes difficult to say that a reasonable victim would feel that the terms and conditions of her employment have changed as a result of the misconduct.

5   *Brooks*, 229 F.3d at 924.  "To hold her employer liable for . . . harassment under Title VII, [a

6   plaintiff] must show that she reasonably feared she would be subject to such misconduct in the

7   future because the [employer] encouraged or tolerated [the co-worker's] harassment."  *Id.*

8          Here, Erickson was a probationary co-worker whose conduct was a one-time event.  The

9   District Defendants had no advance notice Erickson would act out against Page.  Erickson was

10  placed on administrative leave and escorted off District property on the day of the incident.

11  Erickson never returned and his employment was terminated two days later for failing his

12  probationary period based on his conduct towards Page.  These facts are undisputed.  As in

13  *Brooks*, a reasonable victim could not conclude that the terms and conditions of Page's

14  employment changed because of Erickson's one-time misconduct.  The Court cannot objectively

15  conclude Page's work environment could be perceived as abusive because of Erickson's one-

16  time misconduct.

17         Page's hostile work environment claim fails as a matter of law.

18                 2.  Page's other § 1983 Disparate Treatment and Hostile Work Environment Claims

19         Page asserts, "the claims under § 1983 are equally valid" and that "there is ample

20  evidence supporting the first requirement [of a deprivation of a federal right] as previously

21  detailed under § 1981."  (Dkt. No. 81 at 36.)  Page further asserts, "[a]s detailed, under § 1981,

22  Page faced disparate treatment and a hostile work environment, substantiating the claims under

23  § 1983."  (*Id.* at 37.)  It is unclear whether Page bases the § 1983 claims for disparate treatment

24

and hostile work environment on a statute other than § 1981.  Therefore, it is unknown what

additional federal right Page relies on to support a § 1983 claim for disparate treatment and

hostile work environment outside of those arising under § 1981.  To the extent Page asserts

§ 1983 claims for disparate treatment and hostile work environment based on a statute other than

§ 1981, Page has not identified a federal right allegedly violated—and even then, such claims are

doubtful considering Page failed to establish § 1983 claims based on § 1981.

### 3.  Page's § 1983 Claim Based on "Gag Orders" and Qualified Immunity

Page asserts the "gag" orders were "intended to suppress discussion of the

incident . . . thereby stripping Mr. Page of his rights to free expression and to seek redress."  (Dkt

No. 81 at 37.)  In Page's view, the gag orders "constitute[d] unlawful prior restraint on topics of

significant public interest."  (*Id*.)  Other than the alleged prior restraint on speech, Page identifies

no other constitutional right supporting his § 1983 claim.  The District Defendants deny Fire

Chief Maurer's and Captain Simukka's statements constituted unlawful prior restraints on

speech.  (Dkt. No. 64 at 16–18.)

"The term prior restraint is used to describe administrative and judicial orders *forbidding*

certain communications when issued in advance of the time that such communications are to

occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotation marks omitted).  "A

prior restraint need not actually result in suppression of speech in order to be constitutionally

invalid.  'The relevant question [in determining whether something is a prior restraint] is whether

the challenged regulations *authorizes* suppression of speech in advance of its expression[.]'"

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th Cir. 2009)

(emphasis in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989)).

Put another way, "[f]or there to be *prior* restraint, there must first be *restraint*."  *Information*

1  *Providers' Coalition for Defense of the First Amendment v. F.C.C.*, 928 F.2d 866, 877 (9th Cir.

2  1991) (emphasis in original).

3        The two-step process in *Pickering v. Board of Education*, 391 U.S. 563 (1968) "guides

4  our analysis of restrictions on public employee speech."  *Moonin v. Tice*, 868 F.3d 853, 861 (9th

5  Cir. 2017).  The first step evaluates "whether the restriction at issue impacts a government

6  employee's speech 'as a citizen on a matter of public concern.'"  *Id.* (quoting *Garcetti v.*

7  *Ceballos*, 547 U.S. 410, 418 (2006)).  "Speech involves matters of public concern when it can be

8  fairly considered as relating to any matter of political, social, or other concern to the community,

9  or when it is a subject of legitimate news interest; that is, a subject of general interest and value

10  and concern to the public."  *Id.* at 863 (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)).

11        If the challenged speech restriction at issue reaches expression communicated in a
12  government employee's capacity as a citizen and includes discussion of matters of
      public concern, the question becomes whether the relevant government entity had
13  an adequate justification for treating the employee differently from any other
      member of the general public, as by disciplining or discharging him on the basis
      of speech.

14  *Id.* at 861 (cleaned up).  The *Pickering* analysis applies to prospective restrictions on government

15  employee speech.  In such instances, a court "weighs the impact of the ban as a whole—both on

16  the employees whose speech may be curtailed and on the public interested in what they might

17  say—against the restricted speech's necessary impact on the actual operation of the

18  Government[.]"  *Id.* (quotation marks omitted).  A public employer "has broader discretion to

19  restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at

20  speech that has some potential to affect its operations."  *Id.* at 864.

21        Page claims that two statements constituted prior restraints on speech. First, Page

22  identifies Fire Chief Maurer's statement that "[a]s with any disciplinary action, the District

23  maintains confidentiality.  I would ask that we all respect each other's privacy and not contribute

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) - 20

1   to passing along erroneous information."  Second, Page points to Captain Simukka's statement:

2   "To avoid getting wrapped up into the rumor mill or coffee table talk, the investigation is

3   occurring.  Confidentiality needs to be maintained during the investigation to protect the

4   process."  (*See* Dkt. No. 65-1 at 46.)  Page asserts these statements "advised [him] not to" report

5   Erickson's conduct to law enforcement.  (*Id*. at 39.)  He further argues these statements

6   "instructed [him] specifically not to discuss the incident within the firehouse or with outside

7   parties, severely limiting [his] ability to seek help or process the assault."  (Dkt. No. 83 at 2.)

8   Thus, from Page's perspective, maintaining confidentiality during an investigation to avoid

9   "passing along erroneous information" and to "avoid getting wrapped up into the rumor mill or

10  coffee table talk" was suppression of speech in advance of its expression.

11          However, Fire Chief Maurer's and Captain Simukka's statements did not instruct Page he

12  was prohibited from contacting law enforcement, from seeking other assistance, or from seeking

13  other redress to process the assault.  Moreover, Page was free to engage in peer support through

14  the Sheriff's office (Dkt. Nos. 65-1 at 43, 65-13 at 2) and thus could have spoken with law

15  enforcement about the incident.  Page also had the ability to speak with his union, as his union

16  representative was present at Page's investigative interview.  (*See* Dkt. No. 65-13 at 14.)

17  Moreover, while Page asserts he risked losing his employment if he spoke about the incident,

18  Fire Chief Maurer's and Captain Simukka's statements did not threaten a loss of employment or

19  other disciplinary action.  Thus, Fire Chief Maurer's and Captain Simukka's statements did not

20  impose the specific restrictions Page asserts he was bound by.  *See Information Providers'*

21  *Coalition*, 928 F.2d at 877 ("[f]or there to be *prior* restraint, there must first be *restraint*").

22          Even assuming, as Page asserts, that Chief Maurer's and Captain Simukka's statements to

23  maintain confidentiality during an investigation could be characterized as a directive not to speak

24

1    about the incident with anyone inside or *outside* of the District during the investigation,[4] the

2    restraint was not unreasonable under the circumstances.

3    　　　　Page argues discussion about Erickson's conduct outside of the District constituted a

4    matter of public concern because such conduct raised potential issues about the "safety of

5    [District] employees," "operational and training failures," or possible "racially motivated

6    violence committed" at the District.  (Dkt. No.81 at 39.) CITATION IS MISSING HERE.

7    Accepting these assertions as true, these subjects could be matters of "political, social, or other

8    concern to the community," or subjects "of general interest and value and concern to the public."

9    *Moonin*, 868 F.3d at 863.  Therefore, the directive to maintain confidentiality during the

10    investigative process could be viewed in this case as a restriction that impacted a government

11    employee's speech (Page's speech) as a citizen on a matter of public concern.

12    　　　　Moving to the second step of the *Pickering* analysis, the question becomes whether the

13    District had an adequate justification for treating Page differently from any other member of the

14    general public during the investigative process.  While Page had an interest in speaking about the

15    incident and the public had an interest in knowing about possible assaultive behavior at the

16    District, the District had "a legitimate interest in preventing the spread of erroneous information

17    related to the Incident during and after the investigation."  (Dkt. No. 64 at 23.)  Presumably, the

18    need to identify and maintain accurate information about the incident impacted the operation of

19    the District.  Only through accurate information could the District determine what occurred and

20

21    [4] Page asserts Fire Chief Maurer's and Captain Simukka's statements also "mandat[ed]
      silence . . . after the investigation."  (Dkt. No. 81 at 39.)  However, Fire Chief Maurer's
22    statement identified that the District *itself* maintains confidentiality regarding disciplinary actions
      and requested that employees not pass along erroneous information.  Likewise, Captain
23    Simukka's statement told the employees confidentiality was required *during* the investigation to
      protect the investigative process.  On their face, neither of their statements expressly prohibited
24    employees from speaking about the incident after completion of the investigation.

1    then take steps to address the conduct and avoid future improper conduct.  (*See* Dkt. No. 65-17 at

2    2) ("When the time is appropriate, the District will evaluate what change we can make to ensure

3    that this type of incident doesn't occur in the future.").  Thus, the District had a legitimate

4    interest in limiting certain speech during the investigative process that had some potential to

5    affect its operations.  *Moonin*, 868 F.3d at 864.

6        Weighing the District's interest in conducting an accurate and complete investigation

7    against Page's interest in speaking about the incident, the Court concludes the District had an

8    adequate justification for treating Page differently than any other member of the public during

9    the investigation of Erickson's conduct.  The restraints contained in Chief Maurer's and Captain

10   Simukka's statements appear adequately justified considering that Page had the ability to speak

11   with his union about the incident, that Page had the ability to seek counseling through the

12   Sheriff's office, that Fire Chief Maurer's and Captain Simukka's statements did not threaten any

13   discipline, that Fire Chief Maurer's and Captain Simukka's statements sought to eliminate the

14   spread of erroneous information within the District during the investigation, and that Fire Chief

15   Maurer's and Captain Simukka's statements on their face asked that confidentiality be

16   maintained during the investigation to protect the investigative process.  Thus, the Court

17   concludes the District Defendants had a legitimate interest in conducting an investigation that

18   outweighed Page's rights during the investigation.

19       Page nonetheless asserts the "gag orders" were "motivated by a specific intent to

20   suppress the racial context of the assault," and "to obscure a hate crime that, if publicized, could

21   detrimentally affect public support for [a District] levy."  (Dkt. No. 81 at 43–44.)  Though Page's

22   memorandum does not identify any facts supporting these arguments (*see id*.), Page asserts there

23   was an upcoming levy vote soon after the incident that would impact the District's finances (*id*.

24

at 22–23).  He argues, "Chief Maurer was concerned that firing Jon Erickson for his violation of the workplace violence policy could result in public disclosure of the incident, potentially jeopardizing the levy's approval."  (*Id*. at 23.)  But a plain reading of Fire Chief Maurer's testimony—which is the only evidence Page cites as support for this assertion—does not support Page's argument.[5]

In addition, this Court has previously ruled that a public entity's legitimate interests in conducting an investigation and preventing workplace disruption outweigh an employee's speech rights where the employee was only restricted from speaking with fellow employees and the restrictions lasted only until the investigation was completed.  *See Satter v. Washington State Dept. of Ecology*, No. C09-5645BHS, 2010 WL 2342450, at *7 (W.D. Wash. June 8, 2010) (*aff'd* based on grant of qualified immunity *Satter v. Washington State Dept. of Ecology*, 462 Fed. Appx. 685 (9th Cir. 2011)).  *Satter* further supports the conclusions reached in this case.

Even assuming the Court were to find the restraints contained in Fire Chief Maurer's and Captain Simukka's statements were not adequately justified, Chief Maurer and Captain Simukka would be entitled to qualified immunity.  "Qualified immunity exists to shield [a public official] from liability for 'mere mistakes in judgment, whether the mistake is one of fact or one of law.'"

---

[5]    Q. Well, if you had fired Erickson for violating the workplace violence policy, then you could've disclosed that publicly, right?

A. If you say so.  I'm - - I would have to review that - - what I can - -

Q. Well, if a - - public employee is fired for misconduct, that's a matter of public record, right?

A. Correct.

Q. And you could've shared that with the voters if you had fired him specifically for his misconduct correct.

A. I guess voters could've requested a public record, yes.

(Dkt. No. 82-3 at 9.)

1    *Longoria v. Pinal Cnty.*, 873 F.3d 699, 704 (9th Cir. 2017) (quoting *Buzz v. Economou*, 438 U.S.

2    478, 507 (1978)).  Qualified immunity seeks to balance the "need to hold public officials

3    accountable when they exercise power irresponsibly and the need to shield officials from

4    harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.*

5    *Callahan*, 555 U.S. 223, 231 (2009).  In determining whether a public official is entitled to

6    qualified immunity, a court must determine "(1) whether there has been a violation of a

7    constitutional right; and (2) whether such right was clearly established at the time of the []

8    alleged misconduct." *Longoria*, 873 F.3d at 704 (quoting *Lal v. California*, 746 F.3d 1112, 1116

9    (9th Cir. 2014).

10    To determine whether a right is clearly established, "the contours of the right must be

11    sufficiently clear that a reasonable official would understand that what he is doing violates that

12    right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "[T]he clearly established law must

13    be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing

14    *Anderson*, 483 U.S. at 640).  Otherwise, "'[p]laintiffs would be able to convert the rule of

15    qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of

16    extremely abstract rights.'" *Id*. (quoting *Anderson*, 483 U.S. at 639).  Accordingly, "[b]ecause

17    the underlying determination pursuant to *Pickering* whether a public employee's speech is

18    constitutionally protected turns on context-intensive, case-by-case balancing analysis, the law

19    regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude

20    qualified immunity[.]" *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998).

21    Page asserts "the clarity of legal standards at the time of the gag orders makes any

22    defense of qualified immunity untenable." (Dkt. No. 81 at 40.)  But Page fails to recognize that

23    the established law must be particularized and that the Ninth Circuit has determined that the

24

1    contours of whether a public employee's speech is constitutionally protected under *Pickering*

2    "will rarely, if ever, be sufficiently 'clearly established.'" *Id.*; *see also Statter*, 462 Fed. Appx. at

3    687.

4            Page appears to rely on *Moonin*, *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir.

5    1999), and *District of Columbia v. Wesby*, 583 U.S. 48 (2018) for the proposition that qualified

6    immunity should not be applied.  (Dkt. No. 81 at 39, 46.)  These decisions are distinguishable.

7    *Moonin* did not involve an on-going investigation into a co-worker's misconduct where the

8    employees were told to maintain confidentiality during the investigation to avoid spreading

9    erroneous information.  Instead, the employees in *Moonin* were given a blanket prohibition on

10   "[a]ll communication with ANY non-departmental and non-law enforcement entity or persons

11   regarding" the agency's K9 program.  *Moonin*, 868 F.3d at 859 (emphasis in the original).

12   Anyone who violated this prohibition would be found to have committed "insubordination and

13   [would] be dealt with appropriately." *Id.*  Based on the context-intensive competing interests

14   asserted by the employee and the government agency, the Ninth Circuit concluded the restraint

15   on speech was not adequately justified and violated the First Amendment.  *Id.* at 868.  The Ninth

16   Circuit went on to conclude (based on various decisions analyzed therein) there was a "'robust

17   consensus' of prior cases [making] clear [that] at the time [the public employer] issued [its] edict

18   that an employer ordinarily may not prohibit its employees from all public discussion relating to

19   a particular department or government program." *Id.* at 874.  Thus, the court denied qualified

20   immunity.  Here, the restraint at issue—maintaining confidentiality during the investigation to

21   avoid the spreading of erroneous information—is clearly different than the restraint in *Moonin*.

22           *Jackson* is a Sixth Circuit decision involving a Rule 12(b)(6) motion. *Jackson*, 194 F.3d

23   at 744.  While *Jackson* involved a restraint on speech forbidding the employee from speaking

24

with the media during the pendency of an on-going investigation of alleged misconduct, the

Sixth Circuit decided it was inappropriate to analyze at that stage of the litigation whether

qualified immunity applied "[b]ecause no discovery [had] yet taken place and the defense of

qualified immunity [was] not clear cut[.]" *Id*. at 748. *Jackson* further stated, [w]hether a

reasonable official should have known that imposing a gag order on a high-ranking public

official would violate [freedom of speech] in connection with an investigation about issues

relating to public corruption by that official *is not obvious as a matter of law*." *Id*. (emphasis

added). *Jackson*, a Sixth Circuit decision, did not establish the contours of unlawful restraints on

speech imposed during a pending investigation to avoid spreading erroneous information in the

Sixth Circuit, much less in the Ninth Circuit.

       Page also cites *Wesby* for the proposition that "there can be the rare 'obvious case,' where

the unlawfulness of the defendant's conduct is sufficiently clear even though existing precedent

does not address similar circumstances." (Dkt. No. 81 at 46.)  However, *Wesby*'s pronunciation

of the "obvious case" scenario was made in the context of an alleged Fourth Amendment

violation.  Even then, the Supreme Court was clear that "a body of relevant case law is usually

necessary to clearly establish the answer with respect to probable cause."  *Wesby*, 583 U.S. at 64

(quotation marks omitted).  The present case does not involve the contours of probable cause

under the Fourth Amendment.  And as already identified, when a *Pickering* analysis is engaged,

the contours of the unlawful restraint at issue will rarely, if ever, be sufficient to find a clearly

established right.

       Page, therefore, fails to identify a clearly established right that Fire Chief Maurer and

Captain Simukka reasonably would have known they were violating when they stated

1    confidentiality should be maintained during the investigation to avoid spreading erroneous

2    information.  Fire Chief Maurer and Captain Simukka are entitled to qualified immunity.

3              4.  Page's § 1983 Claim and §§ 1985 and 1986 Claims

4          "Section 1986 imposes liability on every person who knows of an impending violation of

5    section 1985 but neglects or refuses to prevent the violation.  A claim can be stated under section

6    1986 only if the complaint contains a valid claim under section 1985."  *Karim-Panehi v. Los*

7    *Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988).  Page's § 1986 claim, therefore, is

8    dependent on Page's § 1985 claim.  Similarly, "the absence of a section 1983 deprivation of

9    rights precludes a section 1985 conspiracy claim predicated on the same allegations."  *Caldeira*

10   *v. County of Kauai*, 866 F.2d 1175, 1182 (1989).

11         Page's § 1985 conspiracy claims are predicated on the same allegations as one of his

12   § 1983 claims; namely, the "gag orders."  (*See* Dkt. No. 81 at 42) ("The first element of [the

13   § 1985] conspiracy is the presence of a deliberate collaboration among two or more individuals.

14   In this case, the imposition of gag orders by senior officials within FD6[.]").  Having already

15   concluded Page's § 1983 claim predicated on Fire Chief Maurer's and Captain Simukka's

16   statements is not actionable, the Court finds that Page's § 1985 claim is likewise unactionable,

17   which in turn renders Page's § 1986 claim unactionable.

18         Independently, the individual District Defendants argue they are entitled to qualified

19   immunity for any claims brought under § 1985 and § 1986 based on the intracorporate-

20   conspiracy doctrine.  (Dkt. No. 64 at 24.)  The Supreme Court "has not given its approval to [the

21   intracorporate-conspiracy] doctrine in the specific context of § 1985(3)," noting that there exists

22   a division amongst the courts of appeals on its application to § 1985(3) claims.  *Ziglar v. Abbasi*,

23   582 U.S. 120, 153 (2017).  "Yet the fact that the courts are divided as to whether or not a

24

1    § 1985(3) conspiracy can arise from official discussions between and among agents of the same

2    entity demonstrates that the law on the point is not well established." *Id*. at 154.  This means "a

3    reasonable official lacks the notice required before imposing liability" for discussions or

4    decisions in their official capacities. *Id*.  "It follows that reasonable officers [of a public entity]

5    would not have known with any certainty that the alleged [restraints] were forbidden by law."

6    *Id*.  As such, the individual District Defendants would also be entitled to qualified immunity for

7    the § 1985(3)[6] claims based on the uncertainty of the application of the intracorporate-conspiracy

8    doctrine.

9            5.  *Monell* Liability

10           Absent an underlying violation of a federal right, there is no basis to impose *Monell*

11   municipal liability.  Accordingly, having concluded all of Page's §1983 claims fail as a matter of

12   law, Page's *Monell* claims fail.

13   **D.  Page's State Law Claims**

14           1.  WLAD (Claim 10)

15           Page first asserts "where a discrimination claim has been established under Title VII . . . ,

16   it has also been established under the WLAD." (Dkt. No. 81 at 47.)  However, Page never

17   alleged a Title VII claim.  Presumably, Page is referring to his § 1983 claims that were based on

18   § 1981—disparate treatment and hostile work environment.  For virtually identical reasons the

19   § 1983 claims based on § 1981 fail, Page cannot establish his WLAD claims.

20

21

22   _____

23   [6] Page's operative complaint does not specify what section of § 1985 he bases his conspiracy
     claims on.  However, Page cites to *United Brotherhood of Carpenters and Joiners of America v.*
     *Scott*, 463 U.S. 825, 828–829 (1983), to identify the elements of his § 1983 claim.  (Dkt. No. 81
24   at 42.)  *United Brotherhood* involved a claim under § 1985(3).  463 U.S. at 827.

1       Under the WLAD, "[d]isparate treatment occurs when an employer treats some people

2 less favorably than others because of race, color, religion, sex, or other protected status." *Alonso*

3 *v. Qwest Communications Co., LLC*, 315 P.3d 610, 615 (Wash. Ct. App. 2013). "[A] plaintiff

4 must show that his employer simply treats some people less favorably than others because of

5 their protected status" through either direct evidence or the *McDonnell Douglas* burden-shifting

6 test that gives rise to an inference of discrimination. *Id*. at 616. "Under the direct evidence test,

7 a plaintiff can establish a prima facie case by providing direct evidence that (1) the defendant

8 employer acted with a discriminatory motive and (2) the discriminatory motivation was a

9 significant or substantial factor in an [adverse] employment decision." *Id*. "An adverse

10 employment action involves a change in employment conditions that is more than an

11 inconvenience or alteration of one's job responsibilities, such as reducing an employee's

12 workload and pay. A demotion or an adverse transfer, or a hostile work environment, may also

13 amount to an adverse employment action." *Id*. at 617 (internal citation omitted).

14       "The four elements of a prima facie hostile work environment claim are: (1) The

15 harassment was unwelcome, (2) the harassment was because of [a protected class], (3) the

16 harassment affected the terms and conditions of employment, and (4) the harassment is

17 imputable to the employer." *Antonius v. King County*, 103 P.3d 729, 732 (Wash. 2004). "To

18 hold an employer responsible for the discriminatory work environment created by a plaintiff's

19 supervisor(s) or co-worker(s), the employee must show that the employer (a) authorized, knew,

20 or should have known of the harassment and (b) failed to take reasonably prompt and adequate

21 corrective action." *Glasgow v. Georgia-Pac. Corp.*, 693 P.2d 708, 712 (Wash. 1985).

22       As with his federal disparate treatment claim, Page's WLAD disparate treatment claim

23 fails because there is no evidence of an adverse employment action. There is no evidence Page's

24

job responsibilities, such as workload or pay, were ever impacted.  Nor is there evidence the

District demoted Page or instituted an adverse transfer or treated Page differently than any of his

co-workers *because of* a protected status.  To the extent Page asserts the "gag orders" affected

him differently, there is no evidence of a racially motivated reason behind Fire Chief Maurer and

Captain Simukka informing *all* the recruits and *all* District employees that confidentiality should

be maintained during the investigation to avoid spreading erroneous information.

Similarly, the District cannot be held liable for Erickson's one-time conduct because

there is no evidence the District authorized, knew, or should have known Erickson was going to

place a knotted rope around Page's neck.  While Page argues the District "maintained a custom

of allowing violent horseplay, and failed to train" the recruits on discrimination, harassment, and

workplace violence prior to the incident (Dkt. No. 81 at 37), a reasonable juror would not

conclude that the type of common horseplay described by the various witnesses, *see* Section

II.G. *supra*, was remotely similar to Erickson's actions—which Page has characterized as the

"simulated lynching" of an African American (*id*. at 32).  Nor could a reasonable juror conclude

the District should have known Erickson would engage in the "simulated lynching" of a fellow

recruit as a result of the recruits not participating in a discrimination, harassment and workplace

violence training during the academy.

Page's WLAD claims, therefore, are dismissed as a matter of law.

2. Wrongful Discharge

i. *Constructive (Claim 11)*

To establish a claim for constructive discharge, a plaintiff must show "(1) the employer

deliberately made the employee's working conditions intolerable, (2) a reasonable person would

be forced to resign, (3) the employees resigned solely because of the intolerable conditions, and

1    (4) the employee suffered damages." *Crownover v. State ex rel. Dept. of Transp.*,265 P.3d 971,

2    980–81 (Wash. Ct. App. 2011). "The word 'deliberately' requires a deliberate act of the

3    employer creating the intolerable condition, without regard to the employer's mental state as to

4    the resulting consequence." *Sneed v. Barna*, 912 P.2d 1035, 1039 (Wash. Ct. App. 1996) (citing

5    *Bulaich v. AT&T Info. Sys.*, 778 P.2d 1031, 1035 (Wash. 1989). "The inquiry is whether

6    working conditions would have been so difficult or unpleasant that a reasonable person in the

7    employee's shoes would have felt compelled to resign." *Id*. (quoting *Stork v. International*

8    *Bazaar, Inc.*774 P.2d 22, 29 (Wash. Ct. App. 1989) (internal quotation marks omitted). This

9    normally is a factual question for trial. *Id*. "[C]ourts usually look for evidence of either

10   'aggravating circumstances' or a 'continuous pattern of discriminatory treatment' to support a

11   constructive discharge claim." *Id*. (quoting *Wunderly v. S.C. Johnson & Son, Inc.*, 828 F. Supp.

12   801, 806 (D. Or. 1993)).

13          Page argues, "the racially motivated assault against Page, followed by the imposition of a

14   gag order, clearly exemplifies deliberate actions taken to create intolerable working conditions."

15   (Dkt. No. 81 at 51.)  However, the only conclusion supported by the record is that Erickson acted

16   alone when he placed a knotted rope around Page's neck.  There is no evidence any of the

17   District Defendants were aware that Erickson would act out.  Therefore, there is no basis to

18   conclude the District Defendants were responsible for the racially motivated assault.  And as

19   already identified, the "gag orders" were not an unlawful prior restraint on speech.  Moreover,

20   the District placed Erickson on administrative leave on the afternoon of the incident, escorted

21   him off District property, investigated the incident, and terminated Erickson's employment

22   within two days of the incident.  Page also was offered peer counseling through the Sheriff's

23

24

1    office and had access to his union representative.  Based on these undisputed facts, a reasonable

2    juror could not find the District deliberately created intolerable working conditions.

3            Page's constructive discharge claim fails as a matter of law.

4                    ii.   *In Violation of Public Policy (Claim 12)*

5            Wrongful discharge in violation of public policy is an intentional tort in which the

6    "plaintiff must establish wrongful intent to discharge in violation of public policy."  *Korslund v.*

7    *DynCorp Tri-Cities Services, Inc.*, 125 P.3d 119, 124–25 (Wash. 2005).  To make out a claim, a

8    Plaintiff must show: "(1) the existence of a clear public policy (*clarity* element); (2) that

9    discouraging the conduct in which [he or she] engaged would jeopardize the public policy

10   (*jeopardy* element); (3) that the public-policy-linked conduct caused the dismissal (*causation*

11   element)"; [and] (4) the defendant must not be able to offer an overriding justification for the

12   dismissal (*absence of justification* element)."  (*Id*. at 125) (internal quotations marks omitted).

13          The District Defendants assert the record does not show Page "was engaged in public-

14   policy linked conduct."  (Dkt. No. 64 at 29.)  Page offers nothing more than the statement that

15   "the purpose of the wrongful discharge tort [is] namely, the deterrence of discharge in violation

16   of public policy."  (Dkt. No. 81 at 50) (quoting *Blackman v. Omak School Dist.*, No. 2:18-CV-

17   0338TOR, 2019 WL 2396569, at *4 (E.D. Wash. Jun. 6, 2019)).  Page makes no attempt to apply

18   the elements for wrongful discharge in violation of public policy to any of the facts of the case.

19          It is not for the Court to formulate Page's arguments by attempting to identify facts to

20   support his claim.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("[j]udges are not

21   like pigs, hunting for truffles buried in briefs").

22          Having failed to offer any facts are argument in support of this claim, the Court

23   concludes Page's wrongful discharge claim in violation of public policy fails as a matter of law.

24

1          3.   Outrage (Claim 13)

2          "The tort of outrage requires the proof of three elements: (1) extreme and outrageous

3   conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to

4   plaintiff of severe emotional distress."  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003).  "The

5   first element requires proof that the conduct was 'so outrageous in character, and so extreme in

6   degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

7   utterly intolerable in a civilized community.'"  *Robel v. Roundup Corp.*, 59 P.3d 611, 619

8   (quoting *Dicomes v. State*, 782 P.2d 1002 (Wash. 1989)).  The conduct must be such that "the

9   recitation of the facts to an average member of the community would arouse his resentment

10  against the actor and lead him to exclaim 'Outrageous!'"  *Kloepfel*, 66 P.3d at 632 (quoting *Reid

11  v. Pierce Cnty.*, 961 P.2d 333, 337 (Wash. 1998)).  On summary judgment, a court "must make

12  an initial determination as to whether the conduct may reasonably be regarded as so extreme and

13  outrageous as to warrant a factual determination by the jury."  *Doe v. Corp. of the President of

14  the Church of Jesus Christ of Latter-Day Saints*, 167 P.3d 1193, 1204) (Wash. Ct. App. 2007)

15  (internal quotation marks omitted).

16          Page asserts "Erickson's racially motivated assault against Elijah Page clearly constitutes

17  extreme and outrageous conduct."  (Dkt. No. 81 at 53.)  But as with his other claims, Page fails

18  to identify facts supporting the conclusion that the District Defendants knew or should have

19  known Erickson was going to place a knotted rope around Page's neck.  Therefore, although

20  "Erickson's racially motivated assault" may be deemed extreme and outrageous conduct, the

21  record does not support an imputation of Erickson's one-time actions to the District Defendants.

22          Page also asserts the outrage claim is based on "subsequent administrative actions

23  including the imposition of a gag order[.]"  (*Id.* at 54.)  As to "gag order," it "not only sought to

24

1    suppress the discussion of the incident but also further victimized Page by isolating him and

2    denying him the opportunity for redress or support from his community and his peers." (*Id.* at

3    53.)  But, as already concluded, stating that confidentiality should be maintained during an

4    investigation to avoid spreading erroneous information was not an unlawful restraint on prior

5    speech and, therefore, not conduct so extreme in degree as to go beyond all possible bounds of

6    decency or be regarded as atrocious and utterly intolerable in a civilized community.  Moreover,

7    Page was offered the opportunity to engage in peer counseling through the Sheriff's office and

8    had the opportunity to engage with his union representative.  These facts do not support the

9    claim that the District Defendants intentionally victimized or isolated Page.

10           Other than the "gag order," Page does not identify the additional "subsequent

11   administrative actions" he believes support his outrage claim.  Notwithstanding, Erickson

12   attempts to support Page's claim by pointing out that Page and his spouse believed the District

13   "downplayed the incident," that the District "rushed" the investigation, and that the District

14   failed to confiscate the rope or take any pictures.  (Dkt. No. 85 at 7.)  Erickson also notes that

15   Page and Erickson believed there was a hostile or dangerous environment after the incident.

16   (*Id.*)  The undisputed facts, however, do not support a conclusion that the investigation was

17   handled in such an extreme and outrageous manner as to warrant a factual determination by the

18   jury.  Page, Erickson, and all witnesses were interviewed.  Page's union representative was

19   present during Page's interview.  The interviews yielded the conclusion that Erickson acted

20   alone.  After the investigative interviews, Erickson was terminated.  Neither Page nor Erickson

21   identify what additional interviews should have been conducted or what additional information

22   should have been gathered to determine how or why Erickson placed a knotted rope around

23   Page.  And although Erickson asserts Page and his wife "testified about 'the hostile' and

24

1    'dangerous environment' at the District after the incident" (*id*.), Erickson does not identify any

2    facts supporting these conclusions—and the Court has concluded Page did not establish a hostile

3    work environment claim, *see supra* Sections III.C.1 and III.D.1.

4         Page's outrage claim fails as a matter of law.

5         4.   Negligent Infliction of Emotional Distress (Claim 14)

6         To establish a claim for negligent infliction of emotional distress, a plaintiff must prove

7    "duty, breach, proximate cause, damage and objective symptomatology." *Kumar v. Gate*

8    *Gourmet, Inc.*, 325 P.3d 193, 205 (Wash. 2014) (internal quotation marks omitted). "The

9    existence of a duty is a question of law and depends on mixed considerations of 'logic, common

10   sense, justice, policy, and precedent.'" *Snyder v. Medical Service Corp. of Eastern Washington*,

11   35 P.3d 1158, 1164 (Wash. 2001) (quoting *Lords v. N. Auto Corp.*, 881 P.2d 256, 260 (Wash. Ct.

12   App. 1994)). "Once this initial determination of legal duty is made, the jury's function is to

13   decide the foreseeable range of danger thus limiting the scope of that duty." *Bernethy v. Walt*

14   *Failor's, Inc.*, 653 P.2d 280, 282 (Wash. 1982). In addition, for claims of negligent infliction of

15   emotional distress, "(1) the emotional distress [must be] within the scope of foreseeable harm of

16   the negligent conduct, (2) the plaintiff [must have] reasonably reacted given the circumstances,

17   and (3) objective symptomatology [must] confirm the distress." *Repin v. State*, 392 P.3d 1174,

18   1184 (Wash. Ct. App. 2017).

19        The District Defendants assert the absence of a duty supporting Page's claim. (Dkt. No.

20   61 at 33–34.) Page asserts the District Defendants "breached both a common law duty not to

21   harm others and statutory duty under Washington state law, which mandates employers provide a

22   safe working environment free from recognizable hazards likely to cause injury[.]" (Dkt. No. 81

23   at 52.) Page claims that the lack of training on discrimination and harassment, the absence of a

24

1    policy against hazing or bullying, and a culture of horseplay "contributed to Erickson's actions

2    and injury to Page." (*Id.*) He further argues the District Defendants "engaged in a clear

3    violation of Page's rights by issuing an unlawful gag order and failing to comply with policies

4    that required reporting the incident." (*Id.*)

5        However, Page does not identify the source of the "common law duty not to harm others"

6    supporting his negligent infliction of emotional distress claim. Logic, common sense, justice,

7    policy, and precedent do not support the existence of a common law duty to prevent the

8    intentional actions of an employee (Erickson)—unless the employer knew or had reason to know

9    the employee would engage in harmful behavior. This conclusion is supported by the fact that in

10   the context of a hostile work environment claim, "[t]o hold an employer responsible for [a]

11   discriminatory work environment created by a plaintiff's supervisor(s) or co-worker(s), the

12   employee must show that the employer (a) authorized, knew, or should have known of the

13   harassment and (b) failed to take reasonably prompt and adequate corrective action." *Glasgow*,

14   693 P.2d at 712. Absent Page identifying a common law duty, Plaintiff's negligent infliction of

15   emotional distress claim fails.[7]

16       As for Page's claim that the District Defendants breached a statutory duty, Page points to

17   sections of Washington's Industrial Safety and Health Act, Chapter 49.17 of the Revised Code of

18   Washington and Washington Revised Code § 49.60.010 (otherwise known as the WLAD). (Dkt.

19   No. 81 at 52.) However, Page provides no authority to conclude that Washington's Industrial

20   Safety and Health Act can be used to support a claim for negligent infliction of emotional

21

22   ───────────────

     [7] Erickson identifies that "[f]oreseeability determines the scope of a defendant's duty" and that

23   there must be a "foreseeable risk, a threatened danger of injury, and conduct unreasonable in
     proportion to the danger." (Dkt. No. 85 at 9) (citing *Hunsley v. Giard*, 553 P.2d 1096, 1103

24   (Wash. 1976)). But both Erickson and Page fail to identify the common law duty at issue and,
     therefore, the factual issues Erickson seeks to raise are irrelevant.

distress arising out of the intentional actions of a co-worker (or an investigation where

employees are told confidentiality should be maintained during an investigation to avoid

spreading erroneous information).  As for the WLAD, the Court addressed Page's WLAD

claims; *see supra* Section III.D.1.  Having found Page's claim under the WLAD fails as a matter

of law, the WLAD cannot support a negligent infliction of emotional distress claim.

> Page's negligent infliction of emotional distress claim fails as a matter of law.

### 5.  Negligent Training/Supervision (Claim 15)

To prevail on a claim for negligent supervision, a plaintiff must show that:

> (1) an employee acted outside the scope of his or her employment; (2) the employee presented a risk of harm to other employees; (3) the employer knew, or should have known in the exercise of reasonable care that the employee posed a risk to others; and (4) that the employer's failure to supervise was the proximate cause of injuries to other employees.

*Briggs v. Nova Services*, 147 P.3d 616, 622 (Wash. Ct. App. 2006), *aff'd*, 213 P.3d 910 (2009)

(citing *Niece v. Elmview Group Home*, 929 P.2d 420, 426 (Wash. 1997)).

The District Defendants assert the record does not support a finding that they knew or

should have known in the exercise of ordinary care that Erickson posed a risk to others.  (Dkt.

No. 64 at 34–35).  Page responds that the "culture of violent horseplay" coupled with lack of

training on discrimination, harassment, and bullying "directly contributed to the hostile and

unsafe work environment that ultimately harmed Page."  (Dkt. No. 81 at 54–55.)

Page's arguments, however, do not address how or why the District Defendants knew or

should have known Erickson posed a risk to Page (or others).  The undisputed facts identify that

Erickson underwent a background check, including a criminal history check and a social media

review.  (Dkt. No. 65-6 at 5–6.)  Erickson also underwent a psychological evaluation.  (*Id*. at 10.)

No information was discovered indicating that Erickson would or could pose a risk to others.

1   And the examples of horseplay provided by the various witnesses did not resemble Erickson's

2   conduct toward Page.

3           Accordingly, Page's negligent supervision claim fails as a matter of law.

4           **IV.    MOTIONS TO STRIKE AND FOR RELIEF FROM DEADLINE**

5           Page asked the Court to strike 600 words from the District Defendants' motion for

6   summary judgment based on the word count limits contained in Local Civil Rule 7(e)(6).  (Dkt.

7   No. 81 at 1–2.)  Likewise, the District Defendants asked the Court to strike all pages beginning at

8   Section C of Plaintiff's response.  (Dkt. No. 91 at 16–17.)  Both motions are DENIED as MOOT.

9           Nonetheless, the District Defendants raise legitimate concerns about Page's 56 page

10  "joint" response filed in opposition to the District Defendants' and Erickson's independent

11  motions for summary judgment.  The "joint" response was not a joint response.  Page dedicated

12  six sentences to Erickson's motion for summary judgment, which lacked any substantive facts or

13  legal argument.  The Court commends the District Defendants for "declining to move for

14  sanctions, however warranted, for Plaintiff's counsel's egregious behavior" (*id.* at 17), which the

15  Court may have favorably reviewed.[8]

16          The District Defendants also asked the Court to strike the declaration of Page's expert,

17  Garen Weitman, Psy.D., based on the alleged untimely disclosure of Dr. Weitman's opinions.

18  (*Id.* at 18–20.)  This motion also is DENIED as MOOT considering the Court's ruling on Page's

19  outrage and negligent infliction of emotional distress claims herein.  Page's corresponding

20  motion for relief from of deadline (Dkt. No. 96) is DENIED as MOOT for the same reasons.

21          **V.    CONCLUSION**

22

23
    _____

24  [8] This is not an invitation to file a new motion on this particular subject, as that time has passed.

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) - 39

1

Having considered the District Defendants' motion, the briefing of the Parties, and the

2

remainder of the record, the Court finds and ORDERS that Defendant's Motion for Summary

3

Judgment (Dkt. No. 64) is **GRANTED.**  All remaining claims against the District Defendants are

4

dismissed with prejudice.

5

In addition, all motions to strike contained within the Parties' memoranda and Page's

6

independent motion for relief from deadline (Dkt. No. 96) are DENIED as MOOT.

7

Dated this 4th day of November, 2024.

8

9

David G. Estudillo
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24